UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-60343

_____


BAUHAUS USA, INC.,

Plaintiff-Appellant,

v.

Lillie Regina Holmes COPELAND, ect; ET AL,

Defendants,

Lillie Regina Holmes COPELAND,
as natural guardian and next friend of Reshan Holmes; and
Reshan HOLMES, a minor,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

May 21, 2002


Before DAVIS, WIENER, and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiff Bauhaus USA, Inc. ("Bauhaus"), appeals from the district court's dismissal of its declaratory judgment action to enforce the terms of an employee benefit plan against defendants Lillie Regina Holmes Copeland and her daughter Reshan Holmes. Bauhaus sought a declaratory judgment in the district court that it was entitled, under the terms of the plan, to funds resulting

from a settlement between defendants and third-party tortfeasors. The defendants moved to dismiss the case, arguing that the Employee Retirement Income Security Act of 1974 ("ERISA")[1] does not preempt Mississippi's anti-assignment rule. The district court granted the defendants' motion. Because we conclude that ERISA does not authorize Bauhaus' declaratory judgment action, we do not reach the preemption question.

I.

On June 1, 1996, James Davis crashed the vehicle he was driving into a car carrying seven year-old defendant Reshan Holmes, who suffered injuries. Holmes is the daughter of defendant Lillie Regina Holmes Copeland. Copeland was an employee of Bauhaus, the sponsor and administrator of an employee benefit plan (the "Plan") that covered Copeland as a participant and Holmes as a beneficiary. Although the Plan did not cover injuries resulting from the acts of another, the Plan honored Copeland's request for benefits and elected to advance payments for Holmes' medical expenses in the amount of $46,229.45.

According to the Plan's provisions, one condition of any advance payment of benefits is that the Covered Person reimburse the Plan out of any recovery against a third party. In relevant part, the Plan provides:

> Medical care benefits are not payable to or for a
> person covered under this Plan when the injury or illness to

---

[1] 29 U.S.C. § 1001 et seq (2002).

-2-

the Covered Person occurs through the act, omission or alleged negligence of another person . . . .

However, the Plan may elect to advance payment for Medical Care expenses incurred for an injury or illness in which a third party may be liable if the Covered Person agrees to the following:

The Covered Person will reimburse the Plan out of the Covered Person's recovery for all benefits paid by the Plan. The Plan will be reimbursed prior to the Covered Person receiving any monies recovered from a Third Party or their insurer as a result of judgment, settlement or otherwise . . . .

. . . .

The Covered Person further agrees that he will not release any third party or their insured without prior written approval from the Plan, and will take no action which prejudices the Plan's subrogation right.

The Plan defines "Covered Person" to include both employees and their minor children. The Plan is self-funded--that is, it does not purchase an insurance policy but is funded only by the sponsoring employer--here Bauhaus. The parties agree that the Plan is an employee welfare benefit plan governed by ERISA.

Davis, the driver of the other vehicle, was an employee of James M. Newman, who did business as Newman Trucking and was insured by Canal Insurance Company. Copeland, on behalf of the minor, sued these parties (collectively, the "Tortfeasors")in Mississippi state court, and they eventually negotiated a settlement of the claims, including medical expenses, in return for $750,000.

For legal standing to represent Holmes in litigation,

Copeland sought and was granted appointment as Holmes' legal guardian. In the context of that guardianship case, Copeland petitioned the Mississippi Chancery Court for authority to settle Holmes' claim against the Tortfeasors according to the proposed settlement agreement. The settlement agreement required the Tortfeasors to pay into the Registry of the Lee County Chancery Court $78,161.47 of the settlement proceeds, an amount sufficient to cover all liens against the proceeds. The agreement further stated that all parties with claims against that money would then be "served with process in the interpleader action."

A separate interpleader action never developed. Rather, the Chancery Court ordered that the Plan be made a party to the guardianship case and required to show why the Tortfeasors should not be given a release. The Plan then gave notice of removal of the guardianship case to the Northern District of Mississippi. Holmes moved to remand, and the Plan consented; accordingly, the district court remanded the case to the state court in June 2000.

A week later, Bauhaus, as administrator of the Plan, sued Copeland, Holmes, and the Tortfeasors in the Northern District of Mississippi, seeking a declaratory judgment that "Bauhaus is entitled to and shall receive full reimbursement of $46,229.45 from the proceeds of the settlement . . . upon approval by the Chancery Court of the settlement." The crux of Bauhaus' case was, and is, that ERISA preempts the Mississippi law that

requires court approval of the assignment of a minor's right to insurance proceeds.

A week after Bauhaus filed suit in federal court, the Chancery Court approved Copeland's petition to settle Homes' claims. The sum of $78,161.47 remains in the registry of that court, and the guardianship case is still pending.[2] The tort litigation, however, is closed. The Chancery Court's order (1) released the Tortfeasors from all "claims, demands, liens [and] subrogation interests" arising out of the tort litigation, including Bauhaus' claim; and (2) required dismissal of the tort litigation.

The Tortfeasors, Copeland, and Holmes moved the district court to dismiss the action. The Tortfeasors argued that the doctrines of res judicata and release barred Bauhaus from suing them again. Copeland and Holmes contended that dismissal was proper on three grounds: (1) absence of a federal question, because ERISA does not preempt Misssissippi's anti-assignment rule; (2) lack of federal jurisdiction over the funds in question, because they are in the registry of the Mississippi court; and (3) consent to state jurisdiction, because Bauhaus had agreed to remand the guardianship case to state court.

In March 2001, the district court granted the motions to dismiss because it found that ERISA did not preempt Mississippi's

---

[2] At oral argument, the parties agreed that the Chancery Court is collegially awaiting our ruling.

anti-assignment rule, and therefore, that it did not have jurisdiction to hear the case. Bauhaus then filed its notice of appeal. We granted the Tortfeasors' unopposed motion to dismiss them from this case prior to oral argument. Bauhaus now appeals only the district court's dismissal of its claims against Copeland and Holmes.

II.

We review <u>de novo</u> a district court's grant of a motion to dismiss.[3] We must therefore take the complainant's allegations as true, and may not dismiss a claim unless it appears certain that the plaintiff cannot prove any set of facts in support of its claim that would entitle it to relief.[4]

The parties urge this court to decide whether ERISA preempts Mississippi's anti-assignment rule that requires court approval of any assignment of a minor's interest in insurance proceeds.[5] Before we may reach the merits of the parties' preemption arguments, however, we must make certain that jurisdiction is

---

[3]     <u>Carney v. Resolution Trust Corp.</u>, 19 F.3d 950, 954 (5th Cir. 1994) (citing <u>Benton v. United States</u>, 960 F.2d 19, 21 (5th Cir. 1992)).

[4]     <u>Id.</u>

[5]     The Mississippi Supreme Court articulated this rule in <u>McCoy v. Preferred Risk Ins. Co.</u>, 471 So.2d 396, 397-99 (Miss. 1985) and <u>Methodist Hospitals v. Marsh</u>, 518 So.2d 1227, 1228 (Miss. 1988).

proper in this case.[6] "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it."[7]

ERISA grants the federal courts "exclusive jurisdiction of civil actions under this title brought by . . . [a] fiduciary."[8] The parties agree that the Plan is governed by ERISA and that Bauhaus, as administrator of the Plan, is a "fiduciary" under

---

[6]    There is no independent ground for federal question jurisdiction under § 1331 based on plaintiff's preemption argument because plaintiff's suit cannot "arise under" ERISA for purposes of § 1331 if ERISA does not authorize the suit.  See Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1 (1983); Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).  In Franchise Tax Board and Taylor, the Supreme Court held that "ERISA preemption, without more, does not convert a state claim into an action arising under federal law."  Taylor, 481 U.S. at 64 (citing Franchise Tax Board, 463 U.S. at 25-27).  A claim that ERISA preempts a state law cannot create federal question jurisdiction where the federal issue is not part of the plaintiff's well-pleaded complaint but could only arise as a defense, unless Congress created a cause of action in the allegedly preemptive statute.  See Franchise Tax Board, 463 U.S. at 25-27; Taylor, 481 U.S. 64-66; see also Erwin Chemerinsky, Federal Jurisdiction § 5.2, at 265-67 (2d ed. 1994).  In Taylor, 481 U.S. 64-66, the Court held that federal jurisdiction existed where ERISA preemption arose as a defense because § 502(a)(1) expressly created a cause of action available to the plaintiff.  The Court reasoned that the federal courts had jurisdiction in that case because "Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court." Id. at 66.  Therefore, because we conclude, as discussed later in this opinion, that § 502(a)(3) does not authorize Bauhaus' suit, the preemption claim cannot form the basis of federal question jurisdiction.

[7]    Arizonans for Official English v. Arizona, 520 U.S. 43, 73 (1997) (internal citation omitted).

[8]    29 U.S.C. § 1132(e)(1) (1994).

-7-

ERISA. The only question that this court must resolve to determine whether jurisdiction is proper, therefore, is whether ERISA authorizes Bauhaus' suit.

ERISA § 502(a)(3) authorizes a civil action "by a . . . fiduciary (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan."[9] ERISA authorizes Bauhaus' suit, and this court has jurisdiction then, only if Bauhaus' declaratory judgment action is an action "to enjoin any act or practice which violates . . . the terms of the plan" or "to obtain other appropriate equitable relief."[10]

In Mertens v. Hewitt Associates,[11] the Supreme Court made clear that the term "equitable relief" in § 502(a)(3) referred only to "those categories of relief that were typically available in equity."[12] In its later, and quite recent, case of Great-West Life & Annuity Insurance Co. v. Knudson,[13] the Court considered a case with facts nearly identical to the instant case.[14] In

---

[9]     29 U.S.C. § 1132(a)(3).

[10]    § 502(a)(3).

[11]    508 U.S. 248 (1993).

[12]    Id. at 256 (emphasis in original).

[13]    534 U.S. 204, 122 S.Ct. 708 (2002).

[14]    Id.

Great-West, Janette Knudson, a beneficiary of an ERISA-governed employee welfare benefit plan, was injured in a car accident.[15] The employee benefit plan included a reimbursement provision similar to the one at issue in the present case; the provision stated that the plan had "'the right to recover from the [beneficiary] any payment for benefits' paid by the Plan that the beneficiary is entitled to recover from a third party."[16] In particular, the Plan had "'a first lien upon any recovery, whether by settlement, judgment or otherwise,' that the beneficiary receives from the third party, not to exceed 'the amount of benefits paid [by the Plan] . . . [or] the amount received by the [beneficiary] for such medical treatment . . . .'"[17] According to this provision, the plan covered $ 411,157.11 of Janette's medical expenses, of which all except $ 75,000 was paid by Great-West.[18]

Janette and her then-husband filed a state tort suit against the Hyundai Motor Company ("Hyundai"), the manufacturer of the car in which they were riding when they were injured, and other tortfeasors.[19] The parties negotiated a $650,000 settlement

---

[15] Id. at 711.

[16] Id. (citing the plan at App. 58).

[17] Id. (citing the plan at App. 58-59).

[18] Id.

[19] Id.

which allocated $256,745.30 to a Special Needs Trust to provide for Janette's medical care; $373,426 to attorney's fees and costs; and $13,828.70 to satisfy Great-West's claim under the plan's reimbursement provision.[20] Before the state court approved the settlement, however, Great-West filed a notice of removal in the federal district court, asserting ERISA claims and that it was a defendant in the state law action.[21] The district court denied Great-West's notice and remanded the case to state court, where that court approved the settlement.[22] Accordingly, the tortfeasors paid the settlement money to the Special Needs Trust and gave the remainder to the Knudsons' attorney, who tendered a check in the amount of $13,828.70 to Great-West.[23] Instead of cashing its check, however, Great-West filed suit in the federal district court seeking declaratory and injunctive relief under ERISA § 502(a)(3) to enforce the reimbursement provision of the plan and recover from the settlement proceeds the $411,157.11 it had advanced to Janette.[24]

The Supreme Court held that ERISA did not authorize Great-West's suit, and therefore, affirmed the dismissal of the

---

[20]   Id.

[21]   Id.

[22]   Id.

[23]   Id.

[24]   Id. at 712.

action.[25]  The Court found that Great West was not seeking "to enjoin any act or practice which violate[d] . . . the terms of the plan" or "to obtain other appropriate equitable relief" under § 502(a)(3).[26]  Declining to construe Great-West's complaint as seeking a remedy that was "typically available in equity" as <u>Mertens</u> requires, the Court reasoned that Great-West essentially sought "to impose personal liability on [the Knudsons] for a contractual obligation to pay money-relief that was not typically available in equity."[27]

The Court refused to accept Great-West's argument that the relief it sought met the <u>Mertens</u> standard.[28]  First, the Court rejected Great-West's contention that Great-West sought an injunction or specific performance to compel the Knudsons to repay the contested funds.  The Court reasoned that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity."[29]

The Court also held that the relief that Great-West sought

---

[25]    <u>Id.</u> at 718-19.

[26]    <u>Id.</u>

[27]    <u>Id.</u> at 712-13.

[28]    <u>Id.</u> at 712-19.

[29]    <u>Id.</u> at 713.

did not constitute restitution <u>in equity</u>.[30]  Distinguishing

restitution in equity from restitution at law, the Court defined

restitution in equity as a "form of constructive trust or

equitable lien, where money or property identified as belonging

in good conscience to the plaintiff could clearly be traced to

particular funds or property <u>in the defendant's possession</u>."[31]

The Court reasoned that Great-West did not seek restitution in

equity because the proceeds of the settlement to which Great-West

maintained it was entitled were not in the Knudsons' possession,

but were in the Special Needs Trust.[32]  The Court explained that

"[t]he basis for petitioners' claim is not that respondents hold

particular funds that, in good conscience, belong to petitioners,

but that petitioners are contractually entitled to <u>some</u> funds for

benefits that they conferred."[33]

Finally, the Court rejected the contention that the common

law of trusts encompassed the relief sought by Great-West.[34]  The

---

[30]    <u>Id.</u> at 714.

[31]    <u>Id.</u> (emphasis added).  In contrast, the Court defined "restitution at law" as a remedy available to a plaintiff who "<u>could not</u> assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him."  <u>Id.</u> (internal citation omitted) (emphasis in original).

[32]    <u>Id.</u> at 715.

[33]    <u>Id.</u>

[34]    <u>Id.</u> at 717.

-12-

Court found that the trust remedies were "simply inapposite" to the relief sought by Great-West.[35]

We conclude that the facts of the instant case are indistinguishable in principle from Great-West. Both cases involve ERISA-governed employee benefit plans that include reimbursement provisions allowing the plans to recover from any settlement proceeds any amount the plans advanced for medical expenses resulting from third party wrong-doing. Third-party tortfeasors injured the plan beneficiaries in both cases, and the plans advanced funds to the beneficiaries for medical expenses. In both cases, the plan beneficiaries made tort settlements with third-party tortfeasors following suit in state court. In both, the plan administrator or assignee filed suit in the federal district court seeking declaratory relief that it was entitled to repayment of the benefits it had conferred. In the instant case, the settlement proceeds are in the registry of the Mississippi Chancery Court. In Great-West, the proceeds of the settlement were placed in a private Special Needs Trust outside the possession and control of the plan beneficiary. Nevertheless, the defendants in this case, like the Knudsons in Great-West, are not in possession of the disputed funds, a fact that Justice Scalia found extremely important in Great-West.

The Court in Great-West characterized the suit in that case

---

[35] Id.

-13-

as "[a] claim for money due and owing under a contract" and that such a suit is "quintessentially an action at law."[36] Because the facts in today's case are, in principle, indistinguishable from those in <u>Great-West</u>, we are bound by that decision and hold that § 502(a)(3) does not authorize Bauhaus' suit.

### III.

For reasons stated above, we affirm the district court's dismissal of this suit for lack of federal jurisdiction because ERISA does not authorize this suit. Consequently, we do not reach the parties' preemption arguments.

AFFIRMED.

---

[36] <u>Id.</u> at 713 (internal citation omitted).

WIENER, Circuit Judge, dissenting:

Federal preemption is the keystone that gives ERISA's arch the ability to span the nation with a single, uniform, pension and welfare-benefit law. When Congress manifested its intent to create such an exclusive federal presence in that field of law, it expressly decreed perhaps the most comprehensive and pervasive preemption of the present era. In the absence of federal jurisdiction, however, federal statutory preemption fails. Therefore, unless the federal courts cautiously, deliberately, and charily examine every asserted challenge to, or claim of limitation on, subject-matter jurisdiction under ERISA, Congress's command cannot be effectuated to the extent clearly intended.

Unfortunately, in adopting an overly expansive reading of Great-West Life[37] to conclude that the district court lacked jurisdiction over Bauhaus's suit, the panel majority errs. Although I have difficulty in discerning the majority's precise reasoning, I am left no choice but to conclude that my learned colleagues have misunderstood the narrowness of the rule that the Supreme Court announced in that case. Because I am convinced that jurisdiction of this case lies in the federal courts even under Great-West Life, and believe that for us to affirm the district court's dismissal is to frustrate the unmistakable

---

[37]Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S. Ct. 708 (2002).

congressional policy embodied in ERISA, I respectfully dissent.
I can only hope that the majority's result will not chill the
discretionary delivery in this circuit of health care to plan
beneficiaries who are victims of tortfeasors.  Today's tort
victim is a minor; future victims will likely be adults made
legally incompetent by the very tort injuries for which they need
prompt medical care.  Whoever might be the victims, however,
today's ruling could very well harm many of those for whose
benefit Congress enacted ERISA.

I. SUBJECT-MATTER JURISDICTION

Great-West Life, asserts the majority, requires that we affirm
the district court's dismissal.  That assertion is not at all
supported by the realization (alluded to and perhaps relied on by
the majority) that Bauhaus's complaint seeks an extremely narrow
remedy.  And that assertion is utterly refuted by a deeper analysis
and thorough understanding of the Supreme Court's opinion in Great-
West Life.

A.   Declaratory Judgment

The fact that Bauhaus's complaint specifically sought only
declaratory relief[38] does not mean, as the majority seems to imply,

---

[38]Bauhaus captioned and described its federal complaint as a "complaint for declaratory judgment."  The demand and prayer for relief, which Bauhaus never amended, read as follows:
> 20.  Plaintiff demands that this Court enter declaratory judgment in favor of Plaintiff determining and declaring that Bauaus [sic] is entitled to and shall receive full reimbursement of $46,229.45 from the proceeds of the settlement....
> Wherefore, premises considered, Plaintiff prays that this Court declare that Bauhaus USA, Inc. is entitled to $46,229.45 from the aforementioned settlement

that the district court automatically lacks jurisdiction of this case.[39]  It is true that the district court could have had subject-matter jurisdiction only if Bauhaus raised a federal question.[40]  But when we construe Bauhaus's prayer for relief with the liberality that the federal rules require of us, the federal question becomes undeniably apparent.

  1.  ERISA (29 U.S.C. § 1132)

ERISA gives the federal district courts "exclusive jurisdiction of civil actions under this subchapter brought by . . . [a] fiduciary."[41]  No one contests that Bauhaus, as the custodian and administrator of the Plan, is a "fiduciary" within the meaning of this section.  The statute carefully delineates how a fiduciary can enforce its rights judicially under a plan:

  (a) Persons empowered to bring a civil action.  A civil

_____

proceeds and that this Court will advance this matter on its docket, order a speedy hearing as provided in Rule 57 of the Federal Rules of Civil Procedure <u>and for [sic] other general relief to which Plaintiff may be entitled</u> [emphasis added].

[39]The majority accurately states that Great-West sought declaratory judgment; but it is inaccurate to imply, as the majority appears to, that the Court in <u>Great-West Life</u> held that declaratory judgment was not available to ERISA fiduciaries seeking to enforce their plan rights. Great-West sought "<u>injunctive and</u> declaratory relief."  <u>Great-West Life</u>, 122 S. Ct. at 712 (emphasis added).  The Court therefore did not determine whether declaratory relief alone was permissible, but went straight to the underlying claim.  As I shall show, we should do the same here, regardless of the contents of Bauhaus's prayer for relief.  <u>See</u> Part I.A.2–3, <u>infra</u>.

[40]Bauhaus is a Mississippi corporation; Copeland and Holmes are domiciled in Lee County, Mississippi; and the amount in controversy is less than $75,000.  However, ERISA gives the district courts jurisdiction over suits under 29 U.S.C. § 1132(a) "without respect to the amount in controversy or the citizenship of the parties."  29 U.S.C. § 1132(f).

[41]29 U.S.C. § 1132(e)(1).

action may be brought—

. . .

> > (3) by a . . . fiduciary <u>(A) to enjoin any act or practice</u> which violates any provision of this subchapter or the terms of the plan, <u>or (B) to obtain other appropriate equitable relief</u> (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.][42]

Hence the first jurisdictional issue: Is a complaint that demands a purely declaratory judgment a "civil action . . . to obtain other appropriate equitable relief" under § 1132(a)(3)(B)?

The leading case construing "appropriate equitable relief" is <u>Mertens v. Hewitt Associates</u>.[43] In it, the Supreme Court interpreted § 1132(a)(3)(B) to enable plaintiffs to sue for only "those categories of relief that were <u>typically</u> available in equity (such as injunction, mandamus, and restitution but not compensatory damages)."[44] The panel majority cites no case, and I have found none, that addresses the question whether declaratory judgment, <u>taken alone</u>, is "appropriate equitable relief" under § 1132(a)(3).[45]

---

[42]29 U.S.C. § 1132(a)(3) (emphases added). Thus a fiduciary is in a different position from a plan beneficiary or participant, whom ERISA expressly authorizes to seek relief that clarifies a right under a plan. <u>See</u> 29 U.S.C. § 1132(a)(1)(B).

[43]508 U.S. 248 (1993).

[44]<u>Id.</u> at 256 (emphasis original).

[45]In <u>FMC Corp. v. Holliday</u>, 498 U.S. 52 (1990), the Supreme Court reached the merits of a case in which the plaintiff had sought a declaration that it was entitled to subrogation for its payments of the covered person's medical expenses. But <u>FMC</u> was also a diversity case, and thus did not settle the instant question. <u>Id.</u> at 56 ("Petitioner, proceeding in diversity, then sought a declaratory judgment in Federal District Court."). In <u>Heimann v. Natl. Elevator Industry Pension</u>

-18-

To answer this question in the affirmative may seem incongruous at first. Like most courts, we generally view the Declaratory Judgment Act[46] as a procedural statute, not an independent basis of federal jurisdiction.[47] More importantly, the Declaratory Judgment Act became law in the 1930s, just as the Federal Rules of Civil Procedure were merging law and equity. Thus, at least in the federal courts, declaratory judgment was not a remedy "typically available" in equity, as Mertens requires. If the district court's selection of remedies were determined solely by Bauhaus's narrow prayer for relief, I would have to agree with the majority that the district court lacked jurisdiction over Bauhaus's suit.

2.   Rule 54(c)

Nevertheless, the remedies that a federal court may bring to

Fund, 187 F.3d 493 (5th Cir. 1999), we liberally construed a complaint brought by a plan participant under § 1132(a)(1), not by a plan fiduciary under § 1132(a)(3), the provision that applies to this case.

[46]28 U.S.C. § 2201 (permitting a federal court to render a declaratory judgment "[i]n a case of actual controversy within its jurisdiction").

[47]See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–72 (1950); In re B-727 Aircraft Serial No. 21010, 272 F.3d 264, 270 (5th Cir. 2001) ("[T]he Declaratory Judgment Act does not provide a federal court with an independent basis for exercising subject-matter jurisdiction.") (citation omitted); 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2766 (West 3d ed. 1998) (citing cases):

> The operation of the Declaratory Judgment Act is procedural only. By passage of the Act, Congress enlarged the range of remedies available in the federal courts but it did not extend their subject-matter jurisdiction. Thus, prior to deciding whether to exercise its discretion and allow a declaratory-judgment action to be brought, the court must determine if jurisdiction and venue are proper. There must be an independent basis of jurisdiction, under statutes equally applicable to actions for coercive relief, before a federal court may entertain a declaratory-judgment action.

bear are not constrained by a litigant's prayer for relief; rather, the Federal Rules of Civil Procedure command the federal courts to grant relief that complainants do not demand when such relief is appropriate.[48]  As one leading treatise notes,

> adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not.[49]

Thus "coercive relief or damages may be given in a suit seeking a declaratory judgment."[50]  The Rules' policy of mandating liberal construction of pleadings should place Bauhaus's complaint in the <u>Mertens</u> box, because in general, "it is not the...type of relief requested in the demand that determines whether the court has jurisdiction."[51]  As I demonstrate below, Bauhaus is entitled to relief that would pass the <u>Mertens</u> test.

In short, the panel majority implicitly assumes that in our

---

[48]"[E]very final judgment <u>shall</u> grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." FED. R. CIV. P. 54(c) (emphasis added).  <u>See also</u> FED. R. CIV. P. 8(e) ("No technical forms of pleading or motions are required."); FED. R. CIV. P. 8(f) ("All pleadings <u>shall</u> be so construed as to do substantial justice.") (emphasis added); FED. R. CIV. P. 8(a).

[49]10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2664 & n.2 (West 3d ed. 1998) (collecting eight Fifth Circuit cases). <u>See also</u> <u>United States v. Universal Management Servs., Inc.</u>, 191 F.3d 750 (6th Cir. 1999); <u>Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.</u>, 184 F.3d 373 (4th Cir. 1999); <u>Valona v. United States Parole Comm'n</u>, 165 F.3d 508 (7th Cir. 1998).

[50]<u>Id.</u> & n.24 (collecting cases).

[51]<u>Id.</u> & n.9 (collecting cases).

jurisdictional analysis, we must take Bauhaus's prayer for relief at face value, even though the Rules mandate that in awarding relief, federal courts look beyond the prayer to the underlying claim. The facial assumption that the prayer controls the relief, which the majority makes no attempt to defend, is heavy freight with which to lade the language of § 1132(a)(3). It is also clearly at variance with the Supreme Court's insistence in Great-West Life that we should focus on the essential nature of the relief sought, not on the label that creative —— or, in this case, tentative —— lawyering might give the requested remedy.[52] Rather than read this policy-filled statute as irreconcilable with the Rules, we should try to make sense of both and find them compatible if we can in a principled manner —— and I believe that we can.

3. The Remedial Indeterminacy of Declaratory Judgment

Even if we were bound by Bauhaus's prayer for relief (which may or may not be the panel majority's view), the relationship between declaratory judgment and equity can be —— and is here —— far tighter than the majority suggests. For openers, declaratory judgment's historical roots do lie in equity.[53] Such a judgment,

---

[52]Great-West Life, 122 S. Ct. at 713 n.1.

[53]EDWIN BORCHARD, DECLARATORY JUDGMENTS 238–39 (Banks-Baldwin 2d ed. 1941) ("[T]he power granted by the declaratory judgment statutes is more strictly a direction to use an existing power than an authorization of new power. . . . [I]t is both historically and traditionally a power exercised primarily by courts of equity, and even where exercised by law courts it is largely equitable in nature."); id. at 348 (stating that declaratory judgment was "born under equitable auspices and ha[d] preponderantly equitable affiliations").

however, is now a preliminary procedure: as the Declaratory Judgment Act provides, a successful declaratory plaintiff may seek "[f]urther necessary or proper relief" to enforce a declaratory judgment.[54] This suggests that the majority's result may well be premature. Furthermore, the modern view is that, although declaratory judgment in and of itself is neither legal nor equitable, it takes on the character of the underlying right or relation that it declares.[55] A judgment decreeing that Bauhaus is entitled to a particular portion of identifiable funds sojourning in the registry of another court could not conceivably be equated to a declaration that Bauhaus can impose general liability on and collect contractual damages from Copeland and Holmes, which Great-West Life proscribes. Rather — as I shall explain — such a judgment would declare only that Bauhaus is entitled to remedies traditionally available at equity. I am convinced, then, that to whatever extent the majority relies on the narrowness of Bauhaus's prayer for relief to determine that Bauhaus does not seek an equitable remedy and therefore that federal jurisdiction is lacking, the majority errs.

B.    Interpreting Great-West Life

---

[54]28 U.S.C. § 2202.

[55]BORCHARD, supra, at 239 ("[I]n principle declaratory relief is sui generis and is as much legal as equitable."); DAN B. DOBBS, LAW OF REMEDIES § 2.6(3) (West 1993) ("More commonly the declaratory action is regarded as equitable when the underlying dispute is equitable, otherwise it is legal.").

The majority seems to rely chiefly, however, on Great-West Life rather than Mertens, stating that "the facts in today's case are, in principle, indistinguishable from those in Great-West," and apparently drawing from that case the rule that if the disputed funds are not in the possession of an ERISA beneficiary, the ERISA plan cannot sue in federal court. This simply is not the rule that Great-West Life laid down; and, importantly, the instant facts are distinguishable from Great-West Life's facts in the very ways that the Supreme Court found to be dispositive there.

1. The Great-West Life Opinion

In Great-West Life, the Court determined that given the posture of that case, restitution, specific performance, and constructive trust were not equitable remedies that permitted federal jurisdiction of a fiduciary's suit seeking to enforce an ERISA plan's reimbursement provision.[56] Great-West, the ERISA fiduciary that had funded medical care, sued for declaratory and injunctive relief, but Justice Scalia — as we should do here — looked beyond the labels of the requested remedies to their essentials, and held that Great-West actually sought "to impose personal liability on respondents for a contractual obligation to pay money — relief that was not typically available in equity."[57] Creative lawyering can couch this relief as injunctive to prevent

---

[56]Great-West Life, 122 S. Ct. at 713–19.

[57]Id. at 712–13.

violation of a plan, but that does not mask the reality, said the Court.[58]  The Court described the relief that Great-West actually sought as "_legal_ restitution" — "the imposition of personal liability for the benefits that [it] conferred" on the plan participant — not _equitable_ restitution, in which the plaintiff seeks "to restore to the plaintiff particular funds or property in the defendant's possession."[59]  Similarly, the other remedies Great-West sought — injunctive and trust remedies — were, in the posture of Great-West Life, actually legal ones, no matter in what guise they walked.  Therefore, the Court held, the district court lacked jurisdiction.

I part company with the panel majority in my understanding of the Great-West Life Court's basis for these distinctions between legal and equitable remedies.  The majority seizes on the phrase "in the defendant's possession" as a pronouncement that if the disputed funds are not in the defendant's possession, the remedy sought must be legal, not equitable.  This seriously misreads Great-West Life.

The Court's analysis did indeed turn on the fact that the personal-injury proceeds had already been paid out: some to a special needs trust for Knudson, the tort victim, under a provision of California's probate code; some to Knudson's attorney; some to

---

[58]Id. at 713 n.1.

[59]Id. at 715 (emphasis added).

-24-

California Medicaid; and only $14,000 to the ERISA plan that had spent over $410,000 on the victim's care.[60] But the significance of this fact was not simply that the funds were not in the beneficiary's possession; and, conversely, to read the Court's opinion as requiring that the disputed funds be in the defendant's possession is to mistake the relevant analysis.

A closer examination reveals the Court's doctrinal point: <u>After</u> the distribution of the funds, the tort victim herself was left without specific, identifiable funds to which the ERISA plan could assert title.[61] This fact made the remedy that Great-West sought to impose essentially <u>personal and general contractual damages</u> — classically, a <u>legal</u> remedy, which the statute does not permit.[62] In other words, the Court's test was not whether the money was in the defendant's possession <u>vel non</u>, but whether the remedy that the plan sought to impose was legal or equitable; and this distinction turned on <u>where the money to pay the judgment would come from</u>: if from the defendant's personal, fungible, and untraceable resources, the remedy sought was legal and proscribed. That was the case in <u>Great-West Life</u>; that is <u>not</u> the case with

---

[60]<u>Id.</u> at 711 (describing the facts), 714–15 (distinguishing between restitution of personal property in a defendant's possession and imposing personal liability on a defendant). <u>Compare</u> <u>id.</u> at 721 (Ginsburg, J., dissenting) (noting that "whether relief is 'equitable' would turn entirely on the designation of the defendant") <u>with</u> <u>id.</u> at 718 (majority) (expressing no opinion as to whether federal jurisdiction would exist over a suit brought against the trust, rather than its beneficiary).

[61]<u>Great-West Life</u>, 122 S. Ct. at 714–15.

[62]<u>Id.</u> at 712–15.

<u>Bauhaus</u>.

    2.   <u>Disputed Funds Are in State Court Registry</u>

In deciding today's case, the majority glides past the most salient factual distinction between this case and <u>Great-West Life</u> for purposes of the analysis that the Court performed in that case. There was no parallel guardianship proceeding and thus no money in a state-court registry, as there are here. The posture of the instant case thus differs markedly from the posture that ultimately determined the outcome in <u>Great-West Life</u>.

Funds in the registry of a court are deposited in the <u>court's</u> bank, which is otherwise uninvolved in the case. Such funds are truly in legal limbo vis-à-vis parties in interest. Asserting a claim against funds in the registry of the Chancery Court, then, does not require the imposition of general, <u>in personam</u> responsibility on Copeland, Holmes, or anyone else — the quintessentially <u>legal</u> remedy that the <u>Great-West Life</u> Court held was unavailable under § 1132(a)(3)(B). Instead, Bauhaus is contesting title to a specific and identifiable quantum of funds <u>in custodia legis</u> that it claims as its own under the Plan. The court (or its bank) possesses for no one in particular until the rightful owner is determined. Here, the disputed funds have not yet been distributed in the sense seized upon by the Court in <u>Great-West Life</u>, and the parties agree that the funds are more than sufficient to satisfy Bauhaus's claim. There is thus no conceivable danger, in this case's current posture, of the district court's imposing

-26-

general, personal, contractual liability on anyone.  The relief sought by Bauhaus is not <u>in personam</u> against Copeland or Holmes, but is <u>in rem</u> against funds possessed by a neutral stakeholder.

This proposition —— that the location of the instant funds in the Chancery Court's possession, and not in the defendant's possession, should actually <u>defeat</u> a rote application of <u>Great-West Life</u> —— is borne out by this case's resemblance to situations that Justice Scalia specifically and explicitly said <u>Great-West Life</u> did <u>not</u> reach.  He cautioned that the Court did not "decide whether petitioners could have obtained equitable relief against respondents' attorney and the trustee of the Special Needs Trust."[63]  Leaving these questions undecided necessarily meant that the Court's test hinged not on who possessed the disputed funds, but rather on what kind of remedy would enable the plaintiff to recover those funds.  The attorney and the trustee, both technically third parties in <u>Great-West Life</u>, are closely analogous to the Chancery Court here; and that state court is far more neutral among and attenuated from the several claimants here than were the attorney and the trustee in <u>Great-West Life</u>, who were closely aligned with the defendant.  It follows obviously and indisputably that by seeking funds held in the registry of a court —— particularly a

---

[63] 122 S.Ct. at 718.

state court of <u>equity</u>[64] — Bauhaus does not seek to impose (1) a <u>legal</u> remedy (2) of <u>general liability</u> on Copeland or Holmes.  That was the Court's basic concern in <u>Great-West Life</u>, and we could have easily allayed it here.

### 3.    <u>Subrogation, Not Reimbursement</u>

Another important distinction between <u>Great-West Life</u> and the instant case is the nature of the obligation that Bauhaus here seeks to enforce.    The right that Bauhaus asserts is to subrogation, not reimbursement or restitution.

The plan provision at issue is less than pellucid, but when read fairly it requires that the Plan recover funds before the beneficiary does.    The Plan may elect to pay the expenses of a beneficiary injured by a third party <u>if</u> the beneficiary (or "Covered Person") agrees that

> The Covered Person will reimburse the Plan out of the Covered Person's recovery for all benefits paid by the Plan.    The Plan will be reimbursed prior to the Covered Person receiving any monies recovered from a Third Party or their [sic] insurer as a result of judgment, settlement, or otherwise . . . .
> . . .
> The Covered Person further agrees that he will not release any third party or their insured without prior written approval from the Plan, and will take no action which [sic] prejudices the Plan's <u>subrogation</u> right [emphasis added].

---

[64]<u>See</u> MISS. CONST. art 6, § 159:
The chancery court shall have full jurisdiction in the following matters and cases, viz.:
    (a)     All matters in equity;
    (b)     Divorce and alimony;
    (c)     Matters testamentary and of administration; [and]
    (d)     Minor's business[.]

Needless to say, Copeland and Holmes have violated every clause of these paragraphs:  They have failed to turn over funds to Bauhaus; they have themselves recovered before turning over anything; they have released the tortfeasors; and they have taken other actions to the prejudice of Bauhaus's subrogation right.  But the prohibitions on release and prejudicial action, and the requirement that Bauhaus recover its advances before the Covered Person is paid, remove any doubt that this provision is a subrogation provision, not a reimbursement provision, regardless of any loose or contradictory language in the document.  The duty that this provision imposes on Copeland and Holmes becomes even clearer on close inspection of the form that Copeland signed after the accident so that Holmes might receive medical treatment.  In signing that form, Copeland promised, on Holmes's behalf,[65] that:

> I hereby agree that such plan is <u>subrogated</u> and succeeds to the right, which right is hereby assigned to such plan, of such covered individual to recover therefore [sic] against any person who . . . is liable . . . .  I further agree to take all such further action and to execute and deliver . . . such further instruments as may be required to secure the foregoing rights for the plan.

This is in obvious contrast to the contractual provision implicated in <u>Great-West Life</u>.  To quote the Court's description of that provision:

The Plan includes a reimbursement provision that is the

---

[65]Neither party contends on appeal that Copeland's signature was invalid because she technically was not yet Holmes's legal guardian.  Copeland's signature at least implied the contrary, and Bauhaus certainly relied detrimentally on her signature.

basis for the present lawsuit. This provides that the Plan shall have "the right to recover from the [beneficiary] any payment for benefits" paid by the Plan that the beneficiary is entitled to recover from a third party. Specifically, the Plan has "a first lien upon any recovery . . ." that the beneficiary receives from the third party . . . . If the beneficiary recovers from a third party and fails to reimburse the Plan, "then he will be personally liable to [the Plan] . . . up to the amount of the first lien."[66]

This passage explains the Court's reluctance to enforce the Great-West plan provision, which itself provided for personal liability of the beneficiary; Bauhaus's does not. And, again, Great-West Life involved a reimbursement provision, not a subrogation provision.

The subrogation remedy contained in the instant provisions is doctrinally distinguishable from the varieties of restitution discussed in Great-West Life. Subrogation stands on its own as a typically equitable remedy.[67] Unlike garden-variety restitution or reimbursement, subrogation does not require that the contested funds be in the possession of the principal obligor; indeed, they usually are not. This, I submit, is a controlling distinction for the purposes of Great-West Life.

---

[66]Id. at 711 (emphasis added).

[67]See 1 GEORGE E. PALMER, THE LAW OF RESTITUTION (Little Brown 1978) § 1.5(b) ("Subrogation is an equitable remedy that was used as early as the seventeenth century."); DAN B. DOBBS, LAW OF REMEDIES § 4.3(1) (West 1993) (listing subrogation as a "major restitutionary remedy in equity"), § 4.3(4) ("Subrogation is another equitable remedy in which tracing is used to prevent unjust enrichment and to give effective relief to the plaintiff.").

There is no doubt that we have here a classic case of subrogation. See DOBBS, supra note 3, § 4.3(4) ("The most familiar case of subrogation is that of the collision insurer.").

4.   Other Equitable Remedies

The term "subrogation" does not occur anywhere in the majority opinion in Great-West Life, which discusses the remedies that the parties in that case contested: injunction, restitution, and common-law trust remedies.[68]   The panel majority may therefore be holding that subrogation is per se not an equitable remedy under the statute.   To whatever extent the majority views Great-West Life as describing the only remedies available under § 1132(a)(3), the majority fails to recognize that at least two of these three permissible remedies remain available to Bauhaus.[69]   To reiterate, the Great-West Life Court held that restitution and trust remedies were unavailable to the ERISA plan in that case because the plan essentially sought to impose personal and general contractual liability on the beneficiary, which was a legal remedy, and not an equitable one.   That objection does not lie against Bauhaus.

The Supreme Court's discussion of trust remedies is particularly illuminating on this point.   The Court noted that if

---

[68]Great-West Life, 122 S. Ct. at 713–18.

[69]Injunctions may be problematic here.  Neither of the parties has brought to our attention the implications for this case of the Anti-Injunction Act, 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").  This Circuit has previously upheld a district court's dismissal, for failure to state a claim, of a fiduciary's ERISA-preemption action that sought both an injunction against state-court proceedings and a declaratory judgment.  Total Plan Services, Inc. v. Texas Retailers Ass'n, 925 F.2d 142, 144 (5th Cir. 1991).  Furthermore, in a non-ERISA preemption case, this Circuit also stated that declaratory judgment would not be available in cases where the Anti-Injunction Act forbids an injunction.  Texas Employers' Insurance Ass'n v. Jackson, 862 F.2d 491, 506 (5th Cir. 1988).

a trustee advances funds to a trust beneficiary, that beneficiary's interest in the trust may be subject to a charge for repayment of the money lent; but the Court distinguished the situation under scrutiny in Great-West Life by noting that "[t]hese setoff remedies do not give the trustee a separate equitable cause of action for payment from other moneys."[70]  In contrast, the funds in the Chancery Court truly are analogous to the corpus of a trust,[71] so Bauhaus has — or should have — a setoff remedy in federal court.[72] Those funds are not "other moneys," but are instead precisely the identifiable and traceable funds to which Bauhaus is entitled under the Plan.  No judgment for Bauhaus would create a general money obligation.  Rather, such a judgment would equitably dispose of a particular quantum of funds in judicial custody, and would therefore be equitable under the Great-West Life test.

5.   No Remedy in State Court

The fourth and final distinction between today's case and Great-West Life is that here it is uncontroverted that Bauhaus

---

[70]Great-West Life, 122 S. Ct. at 718.

[71]The more direct analogy would of course be to regard the assets of the Plan as held in trust for beneficiaries, but Congress likely did not intend that Bauhaus recover against a beneficiary's interest in the Plan —— in other words, a beneficiary's right to further health benefits.

[72]Neither party, nor the majority, makes an argument from Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456 (1939), and its sequelae regarding concurrent jurisdiction quasi in rem. That doctrine might have been a better basis on which to decide this case than the result reached by the majority, which apparently will protect not only funds held by state courts, but also funds held by tort victims' lawyers and trustees, from federal ERISA jurisdiction, since such funds are also not in the victims' possession.

lacks an adequate remedy in state court.  This difference, while perhaps insufficient on its own to justify viewing the relief Bauhaus seeks as equitable, certainly adds strong support to that conclusion.

In <u>Great-West Life</u>, the justices raised this issue in debating what the Court's holding would mean for cases in which a state-law action is preempted by ERISA.  The majority stated that its opinion did not resolve the question:

> We note . . . that there may have been other means for petitioners to obtain the essentially legal relief that they seek . . . . We express no opinion as to whether petitioners could have intervened in the state-court tort action brought by respondents or whether a direct action by petitioners against respondents asserting state-law claims such as breach of contract would have been pre-empted by ERISA.[73]

This passage reflects the <u>Great-West Life</u> Court's determination that the ERISA plan in that case may have had other remedies available to it.  At the very least, the justices did not view that possibility as foreclosed.

In today's case, though, that possibility is foreclosed. Bauhaus has no adequate legal remedy in either federal or state court.  In federal court, by ERISA's express terms, legal remedies are totally unavailable.  In state court, Bauhaus is already party to the action in Chancery Court; but that action obviously will avail it naught, because, as I describe below, Mississippi's anti-assignment rule holds sway there.  This very problem was foreseen

---

[73]<u>Great-West Life</u>, 122 S. Ct. at 718.

by Justice Ginsburg, dissenting in <u>Great-West Life</u>:

> After today, ERISA plans and fiduciaries unable to fit their suits within the confines the Court's opinion constructs are barred from a federal forum; they may seek enforcement of reimbursement provisions like the one here at issue only in state court. Many such suits may be precluded by antisubrogation laws, others may be preempted by ERISA itself, and those that survive may produce diverse and potentially contradictory interpretations of the disputed plan terms.[74]

The panel majority's result will henceforth require insurers that advance funds to pay for medical treatment of minor or incompetent Mississippi tort victims to seek recovery of those funds in state court, where the insurers are now fated to fall victim to the state rule. What plan administrator would risk fiduciary liability by advancing funds of a plan under these conditions? None. And who will be the victims of this result? Plan beneficiaries injured by third parties.

The total absence of legal remedies in today's case is important because such absence was key to the distinction between equity and law. Although Justice Scalia stated for the majority in <u>Great-West Life</u> that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity,"[75] he went on to discuss several exceptions to this rule, without purporting to exhaust the list of exceptions or identifying the

---

[74]<u>Id.</u> at 722 (Ginsburg, J., dissenting) (citation omitted).

[75]<u>Id.</u> at 713 (majority).

general principle from which those exceptions flow. Yet that principle is widely recognized: When the remedy of damages is not adequate at law, equitable remedies may be sought.[76] This doctrine is so well established that it must be credited as one kind of relief that was "typically available in equity" —— the quintessential alternate equitable remedy that becomes available when legal remedies are inadequate or nonexistent. Here, this conclusion does not run afoul of Justice Scalia's caution that the statutory phrase "equitable relief" cannot mean <u>any</u> remedy, for the simple reason that —— in contrast to <u>Great-West Life</u> —— injunction, subrogation, restitution, and trust remedies are all, in the circumstances of this case, eminently equitable.

Because the <u>Great-West Life</u> Court expressed "no opinion" on questions central to this aspect of the distinction between law and equity, that case simply cannot be read to control the jurisdictional outcome in today's case as mechanically as the panel majority would suggest. I am satisfied that we have the customary latitude here to apply the doctrine of adequacy of legal remedies as requiring resort to an equitable remedy and thus as supporting federal jurisdiction. I am even more satisfied that we have erred by failing to do so.

---

[76]<u>See</u> <u>id.</u> at 725 (Ginsburg, J., dissenting); DAN B. DOBBS, LAW OF REMEDIES (West 1993) § 2.5(1) (discussing irreparable harm test); § 2.5(2) (stating that an equitable remedy is "usually granted" in cases —— such as the insolvency of the defendant —— where "a legal remedy [is] available but not collectible").

Federal courts are certainly courts of limited jurisdiction, but when that jurisdiction is mapped out by a statute like ERISA which textually incorporates equity's long traditions of fairness and flexibility, those traditions must be imported into the jurisdictional cartographic exercise. That this importation might make the exercise less than crisp does not mean that the exercise is illegitimate; on the contrary, it implements Congress's command and therefore is our assigned task. I would hold the remedy Bauhaus seeks in federal court to be equitable under the <u>Mertens</u> test. Indeed, equity arose for the very purpose of correcting such anomalies in a coordinate court system as the one we should correct today.

6. <u>Summary</u>

In sum, I would heed the warning of the dissenters in <u>Great-West Life</u> that if the district courts are held to lack jurisdiction of cases such as this, ERISA plaintiffs like Bauhaus would have to sue in state court, overcome ERISA preemption, and then contend with a welter of disparate state laws — such as Mississippi's anti-reimbursement doctrine at issue here — that could and likely would defeat the congressional purpose of achieving a nationally uniform set of rules to govern ERISA plans.[77] This case presents

---

[77]<u>See</u> <u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1, 9 (1987) (noting that Congress sought through ERISA "to establish a uniform administration scheme" and to ensure that plan provisions would be enforced in federal court, free of "the threat of conflicting or inconsistent State and local regulation") (internal quotation marks omitted).

a stereotypical example of what the Great-West Life dissenters feared; more importantly, its postural facts are readily distinguishable from those of Great-West Life and thus cry out for a recognition of these differences and thus a different outcome. In my view, the remedy that Bauhaus seeks is undeniably equitable; ergo Bauhaus's complaint arises under ERISA; ergo the district court had subject-matter jurisdiction of this case.

Copeland nevertheless advances three defenses to Bauhaus's suit that she describes as jurisdictional: lack of a federal question, lack of federal jurisdiction over the "interpled" funds, and consent to state jurisdiction. To whatever extent my discussion of remedies has not already shown how these three jurisdictional issues should be resolved, they collapse into the preemption question: If ERISA preempts, there is a federal question; federal jurisdiction is exclusive[78]; the Chancery Court lacks jurisdiction to decide this case; and Bauhaus's consent to remand to that court cannot have conferred jurisdiction on it. To preemption, therefore, I now turn — both to round out the jurisdictional argument and to demonstrate what is really at stake in this case.

II. PREEMPTION

---

[78]29 U.S.C. § 1132(e):

Except for actions [by participants or beneficiaries] under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, [or] fiduciary.

The district court granted the motions to dismiss solely on preemption grounds.  The court tersely stated that it

> could engage in a lengthy analysis on the preemption question presented here, but, after careful consideration, the court finds that <u>Clardy v. ATS, Inc. Employee Welfare Benefit Plan</u>, 921 F. Supp. 394 (N.D. Miss. 1996) (Davidson, J.), ably resolves this matter. . . .
> . . . This court is in accord with Judge Davidson's conclusion that
>> the state law under consideration...does not prevent subrogation of claims, nor does it even directly address the matter of subrogation.  The administration of a minor's estate is entirely a matter of state law, and is law of general application which affects a broad range of matters entirely unrelated to ERISA plans.... The [plan] in this case would have this court preempt not a state law which impinges upon contractual subrogation rights under ERISA, but a state law of general application which has only an incidental effect upon an ERISA plan.  The state law in question...relates to ERISA in "too tenuous, remote, or peripheral a manner" to be preempted in this case.[79]

<u>Clardy</u>, on which the district court relied entirely, is but one of several cases in which state and federal courts in Mississippi have held that ERISA does not preempt the state's jurisprudential rule requiring Chancery-Court approval of any assignment of a minor's interest in insurance proceeds.

1.   <u>Mississippi's Anti-Assignment Rule</u>

Mississippi's anti-assignment rule was announced in <u>McCoy v.</u>

_____

[79]<u>Bauhaus, USA, Inc. v. Copeland</u>, 2001 WL 1524373 at *1 (N.D. Miss. 2001) (citing <u>Clardy v. ATS, Inc. Employee Welfare Benefit Plan</u>, 921 F. Supp. 394, 399 (N.D. Miss. 1996)).

Preferred Risk Ins. Co.,[80] in which the Mississippi Supreme Court derived, from that state's uninsured-motorists law, the principle that a parent, acting individually, cannot transfer a child's right to insurance proceeds, even in exchange for medical treatment following the accident that gives rise to the right.[81] That court later extended its McCoy holding by requiring that parents seek chancery-court approval to assign insurance proceeds.[82]

From the purely common-law rule of McCoy, state and federal courts in Mississippi have taken the giant step needed to reach the view that this rule somehow withstands ERISA preemption, oblivious to the universal recognition that ERISA's is one of the most pervasive of all federal preemptions. In Cooper Tire & Rubber Co. v. Striplin,[83] the Mississippi Supreme Court dismissed as "without merit" an employer's argument that ERISA permitted the employer to enforce a subrogation agreement and recover the medical expenses of a covered minor to whom an insurer had paid benefits.[84] The court proceeded from the premise that "Congress did not pre-empt areas

---

[80]McCoy v. Preferred Risk Ins. Co., 471 So.2d 396 (Miss. 1985).

[81]Id. at 398–99; id. at 397–98 ("These [uninsured motorist] benefits were due the son, David, who was the person injured, and his parents as individuals had no authority to assign such benefits.").

[82]Methodist Hospitals of Memphis v. Marsh, 518 So.2d 1227, 1228 (Miss. 1988) ("Mrs. Tina Marsh, the mother, had no legal authority, in the absence of prior chancery court approval, to execute any document binding Stephen's estate insofar as the insurance proceeds to which he was entitled.").

[83]Cooper Tire & Rubber Co. v. Striplin, 652 So.2d 1102 (Miss. 1995).

[84]Id. at 1104.

traditionally regulated by the states" —— areas such as domestic relations and minors' business.[85]  This rallying cry has met with great favor in the Northern District of Mississippi:  The instant case is at least the third in which that court has held that ERISA does not preempt the Mississippi anti-assignment rule.[86]  The district court certainly abided by its own jurisprudence, if nothing more precedential, in finding no preemption here.  But that jurisprudence, examined in the light of Supreme Court precedent, is simply incorrect; for the Mississippi Supreme Court's premise that ERISA does not preempt areas traditionally regulated by the states simply does not hold water.

2.  Preemption under ERISA

ERISA states that "the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[87]  ERISA's provisions preempt state jurisprudential rules as well as state statutes.[88]  It matters not that an ERISA savings clause states that

---

[85]Id. at 1103–04.

[86]See Ashmore v. Healthcare Recoveries, Inc. (In re Ashmore), 1998 WL 211778 at *2 (N.D. Miss. 1998) ("Even if the parties' ERISA plan contained an express subrogation clause, Mississippi law requiring prior chancery court approval of assignment of a minor's right to insurance proceeds would not be preempted by ERISA."); Clardy, 921 F. Supp. 394, 397–401 (N.D. Miss. 1996).

[87]29 U.S.C. § 1144(a).

[88]Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 48 n.1 (1987) ("Decisional law that 'regulates insurance' may fall under the savings clause."); 29 U.S.C. § 1144(c) ("For purposes of this section: (1) The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.").

"nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance"[89]: ERISA's "deemer clause" declares that an employee benefit plan —— which, as all parties concede, the Plan unquestionably is —— shall not be "deemed to be an insurance company . . . or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies."[90] Neither does it matter here that ERISA shall not preempt "any generally applicable criminal law of a State,"[91] a qualified domestic relations order, or a medical child support order.[92]

The Supreme Court has clarified that the "relate[s] to" standard shows that Congress intended ERISA "to establish pension plan regulation as exclusively a federal concern."[93] For example, in FMC Corp. v. Holliday,[94] the Court held that ERISA preempted a Pennsylvania statute that forbade reimbursement or subrogation from a claimant's tort recovery in a motor-vehicle action.[95] There, the

---

[89]29 U.S.C. § 1144(b)(2)(A).

[90]29 U.S.C. § 1144(b)(2)(B).

[91]29 U.S.C. § 1144(b)(4).

[92]29 U.S.C. § 1144(b)(7).

[93]Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981).

[94]FMC Corp. v. Holliday, 498 U.S. 52 (1990).

[95]Id. at 54 (describing the statute); id. at 58 ("Pennsylvania's antisubrogation law 'relate[s] to' an employee benefit plan.").

state law "relate[d] to" an ERISA plan because it "risk[ed] subjecting plan administrators to conflicting state regulations."[96] The Court stated that its construction of ERISA was "respectful of the presumption that Congress does not intend to preempt areas of traditional state regulation" because that construction distinguished between plans —— like the one now before us —— that are self-funded and those that are insured, permitting the states to regulate the latter more closely, in accordance with the states' longstanding role in regulating the insurance industry.[97]

Despite its abstract concern for areas of traditional state regulation, however, when push has come to shove, the Supreme Court has held that ERISA preempts any number of such areas. For example, the Court held that ERISA trumps the effect of Louisiana's community property system and succession laws, prototypical areas of traditional state regulation. In Boggs v. Boggs,[98] the sons of a decedent's first wife (herself also deceased) contended that her assignment to them of her interests in the decedent's annuity was valid under Louisiana law; the second spouse claimed that the annuity was all hers under ERISA.[99] After we, acting as a sharply

---

[96]Id. at 59.

[97]Id. at 62.

[98]Boggs v. Boggs, 520 U.S. 833 (1997).

[99]Id. at 836–38.

divided <u>en banc</u> court, held for the sons,[100] the Supreme Court reversed. Despite the fact that community property laws "implement policies and values lying within the traditional domain of the States,"[101] the Court held that ERISA's survivor annuity provisions preempted and controlled.[102]

Just last year, and more directly relevant to this appeal, the Supreme Court, in <u>Egelhoff v. Egelhoff</u>,[103] confirmed that ERISA preempts a state statutory scheme closely tied to the traditional state concerns of probate and family law. At issue in <u>Egelhoff</u> was the effect of a Washington state statute that automatically revoked, upon a couple's divorce, any designation of a spouse as the beneficiary of a nonprobate asset.[104] Justice Thomas, writing for a majority of seven justices, held that this beneficiary-revocation law had an "impermissible connection with ERISA plans" because it ran counter to ERISA's commands that the plan shall specify those to whom benefits shall be paid and that the fiduciary shall administer the plan in accordance with plan documents.[105] The

---

[100]<u>Boggs v. Boggs</u>, 82 F.3d 90 (5th Cir. 1996), <u>rehearing en banc denied</u>, <u>Boggs v. Boggs</u>, 89 F.3d 1169 (5th Cir. 1996).

[101]<u>Boggs</u>, 520 U.S. at 840.

[102]<u>Id.</u> at 841–44.

[103]<u>Egelhoff v. Egelhoff</u>, 121 S.Ct. 1332 (2001).

[104]<u>Id.</u> at 1325–26.

[105]<u>Id.</u> at 1327–28.

Washington statute, the Court determined, "govern[ed] the payment of benefits, a central matter of plan administration."[106] Furthermore, enforcement of the Washington statute would impermissibly "interfere with nationally uniform plan administration" and raise the possibility that administrators would shift the costs of that interference onto plans' beneficiaries:

> If they instead decide to await the results of litigation before paying benefits, they will simply transfer to the beneficiaries the costs of delay and uncertainty. Requiring ERISA administrators to master the relevant laws of 50 States and to contend with litigation would undermine the congressional goal of minimizing the administrative and financial burdens on plan administrators — burdens ultimately borne by the beneficiaries.[107]

The Court acknowledged that family law is an area of traditional state regulation, but concluded that the presumption against preemption in such an area "can be overcome where, as here, Congress has made clear its desire for preemption. Accordingly, we have not hesitated to find state family law pre-empted when it conflicts with ERISA or relates to ERISA plans."[108]

Egelhoff is not meaningfully distinguishable from this case. Each dispute involves payment of benefits under the plan; each state's law would prevent the plan administrator from relying on the plan's documents alone; and each state's law implicates a

---

[106]Id. at 1328.

[107]Egelhoff, 121 S.Ct. at 1329 (quotation marks, brackets, and citation omitted).

[108]Id. at 1330 (citing Boggs).

traditional area of state regulation.  Albeit prior to <u>Great-West</u> <u>Life</u>, district courts in several circuits have squarely held that, to the extent there is any conflict, ERISA preempts state statutes that protect minors against parental assignment of their insurance proceeds or other parental contracts on their behalf.[109]

Copeland does not address these precedents, virtually ignores <u>Boggs</u> and <u>Egelhoff</u>, and in attempting to distinguish <u>FMC</u>, mischaracterizes what the district court did in the instant case.[110] Copeland has begged the question by relying exclusively on the state and federal precedents from Mississippi, which heretofore have not been tested in the crucible of federal appeals.  Copeland also argues that the ERISA provision exempting "qualified domestic relations orders"[111] from preemption applies; but no qualified

---

[109]See Great West Life and Annuity Ins. Co. v. Moore, 133 F. Supp. 2d 677, 680 (N.D. Ill. 2001) ("The Illinois rule which prohibits insurers from having a right of subrogation and reimbursement against a covered person when the covered person is a minor is preempted under ERISA."); Estate of Lake v. Marten, 946 F. Supp. 605, 610 (N.D. Ill. 1996) ("Subjecting self-funded ERISA plans to various state anti-subrogation laws . . . would be contrary to the purpose of ERISA's preemption clause, which was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans."); Blue Cross and Blue Shield of Alabama v. Cooke, 3 F. Supp. 2d 668, 672 (E.D.N.C. 1997) (finding that ERISA preempted North Carolina's doctrine limiting authority of parents to contract on behalf of their children for anything other than "necessaries"); Rhodes, Inc. v. Morrow, 937 F. Supp. 1202, 1211–12 (M.D.N.C. 1996) (same).

[110]Copeland's appellate brief states that "the district court did not reach a preemption determination because it did not have jurisdiction over the guardianship funds."  This misstates the district court's express holding that ERISA did not preempt Mississippi's anti-assignment rule.  The court summed up thus: "[B]ecause plaintiff is not entitled to a declaration . . . that its entire subrogation claim is valid and enforceable, that matter not having been completely preempted by ERISA, the motions of defendants to dismiss are granted."  Bauhaus, 2001 WL 1524373 at *2 (emphasis added).

[111]29 U.S.C. § 1144(b)(7).

-45-

domestic relations order is at issue here, nor could one be.[112]

To summarize, the Supreme Court has made abundantly clear that by enacting ERISA, Congress spoke loudly and lucidly enough to preempt both Louisiana's marital-property system and Washington's family and probate law. Given these precedents, Mississippi's anti-assignment rule cannot withstand preemption. A minor's financial business is traditionally an area of state regulation, but no more so than family-property, inheritance, or probate law.

### III. CONCLUSION

I regret that my colleagues's parsimoniousness with federal jurisdiction pretermits our addressing this issue and reaching this indubitable result. Plaintiffs who put forward claims that are completely controlled, and indeed vindicated, by the most panoramic and potent federal statutory preemption presently on the books should have their days in federal court.

For the foregoing reasons, I view the district court's dismissal for either lack of jurisdiction or failure to state a claim as reversible error. Despite the majority's reliance on <u>Great-West Life</u> to affirm the district court, I am convinced that the district court did have jurisdiction of this case.

I respectfully dissent.

---

[112]Such an order, to qualify for the exception from ERISA preemption, must "create[ ] or recognize[ ] the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I).